**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

UNITED STATES OF AMERICA :
: Criminal Action No. 08-07-SLR
Plaintiff, :
v. :
:
RYAN EVANS, :
:
Defendant. :

**GOVERNMENT'S POST-HEARING RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS**

The United States, by and through Colm F. Connolly, United States Attorney for the District of Delaware, and Shawn E. Martyniak, Special Assistant United States Attorney for the District of Delaware, for the reasons set forth below, respectfully requests that the defendant's *Motion to Suppress Statements* be denied.

## I. INTRODUCTION.

The Government submits the following factual allegations:

On January 9, 2008, Wilmington Police Officers Randolph Pfaff and Danny Silva authored a search warrant for the premises of 428 South Jackson Street, Wilmington, Delaware and for the person of Ryan Evans (herein "defendant"). On January 10, 2008, the Officers, along with other members of the Wilmington Police Department, executed the search warrant. During the search of the residence, Officers seized a Walther P-99 9mm handgun containing a magazine loaded with fifteen rounds of ammunition, eighty-five bags of heroin weighing approximately 2.55 grams, $1453.00, and other drug paraphernalia.

Shortly after contacting the defendant, Detective Pfaff, verbally gave him *Miranda* warnings. In response to questions by the Detective, the defendant gave incriminating responses

regarding the recovered firearm and money. After making these statements, the defendant advised that he wanted an attorney. Detective Pfaff then terminated the interview with the defendant.

On January 22, 2008, the Grand Jury returned a three count indictment charging the defendant with: 1) possession with intent to deliver heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(c); 2) carrying a firearm during and in relation to a drug-trafficking crime (*i.e.*, Count I) and possessing the firearm in furtherance of said crime, in violation of 18 U.S.C. § 924(c)(1)(A); and 3) being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

On March 14, 2008, the defendant filed a *Pre-Trial Motion to Suppress Statements* requesting that the Court suppress the statements made by the defendant. The defendant, in essence, makes two alternative claims. The defendant first claims that he was not given his *Miranda* warnings. If the Court determines that *Miranda* warnings were given, the defendant claims that any statements he made were not "knowing, intelligent, or voluntary."

On April 30, 2008, this Court conducted an Evidentiary Hearing to hear testimony related to the defendant's assertions. The Government submits that the evidence gained from that hearing shows that the defendant was given his *Miranda* warnings and that his statements to Detective Pfaff were given knowingly, intelligently, and voluntarily; as such, the Government respectfully requests that the defendant's motion be denied.

## II. PROPOSED FINDINGS OF FACT.

On January 10, 2008, members of the Wilmington Police Drug and Vice Division, along

with support from the SWAT team served a daytime search warrant[1] at 428 South Jackson Street, Wilmington, Delaware. (T. 4-5). Detective Randolph Pfaff of the Wilmington Police Department testified that the SWAT team was used to breach the residence due to the defendant's extensive criminal record which includes gun charges, violent crimes, and drug arrests. (T. 4-5).

After the SWAT team breached the front door and secured the residence, Detective Pfaff and Detective Charles Emory responded inside the residence. (T. 5). The Detectives were advised by SWAT that two persons were inside the residence. One individual was identified as the defendant; the second individual was identified as Millicent Evans, the defendant's aunt. (T. 5, 6). Detective Emory responded to the bedroom in which Millicent Evans was located; Detective Pfaff responded to the defendant's location. (T. 5). Several members of the Wilmington Police Vice Unit remained outside the residence. (T. 6).

Detective Pfaff was advised by SWAT team members that the defendant was found in his upstairs bedroom. Upon their arrival, the SWAT team found the defendant's bedroom door locked; the officers had to kick the door in. (T. 7-8). Upon his arrival in the defendant's bedroom, Detective Pfaff found the defendant seated on the bed. (T. 8) The defendant was handcuffed. (T. 8).

Detective Pfaff entered the defendant's bedroom and took note of the bedroom window. (T. 8). Detective Pfaff focused on the window because he had been advised by a fellow Officer that a metal object was thrown from the window and landed in the alleyway. (T. 8, 24-25). Detective Pfaff recalled that the window was opened approximately three inches and the screen

---

[1]The validity of the search warrant is not contested by the defendant.

covering the window had a large hole in it. (T. 8).

After noticing the condition of the window, Detective Pfaff gave the defendant *Miranda* warnings. (T. 8). Detective Pfaff testified that he gave the defendant his *Miranda* warnings because he believed the item thrown from the window was a firearm. (T. 9). Detective Pfaff testified that he gave the following Miranda warnings to the defendant:

> Mr. Evans, you have the right to remain silent. Anything you say can and will be used against you in a court of law. You have a right to an attorney. If you cannot afford to hire an attorney, one will be appointed to represent you. You may have one during questioning, and you may stop answering questions any time you wish. (T. 9).

Detective Pfaff testified that he has given those particular *Miranda* warnings over one thousand times in his eleven-and-a-half years as a police officer. (T. 9-10).

Detective Pfaff asked the defendant if he understood his rights. (T. 10). According to Detective Pfaff, the defendant first moved his head in an affirmative motion indicating that he understood his rights. (T. 10, 22). Detective Pfaff advised the defendant that he required verbal "yes" or "no" answer. (T. 10, 22). The defendant then stated, "Yes." (T. 10, 22).

Detective Pfaff asked the defendant if there were any drugs in the house. (T. 10). The defendant responded in the negative. (T. 10). Detective Pfaff then asked the defendant if there were any large sums of money in the house. (T. 11). The defendant replied, "No." (T. 11). Detective Pfaff asked the defendant if there were any drugs or money in the house. (T. 11). Without making any statement, the defendant physically revealed to Detective Pfaff a large sum of money that was hidden under a pad on top of the mattress. (T. 11).

At some point during Detective Pfaff's questioning, Detective Emory entered the defendant's room and advised Detective Pfaff that a handgun had been recovered in the alleyway.

(T. 25). Detective Pfaff then asked the defendant what type of handgun he threw out of the window. (T. 11). The defendant answered, "[a] nine millimeter." (T. 11).

Although Detective Pfaff entered the defendant's room alone, Corporal Donald Cramer of the Wilmington Police Department was present during Detective Pfaff's questioning regarding the firearm and the defendant's subsequent request for an attorney; Corporal Cramer was not present during Detective Pfaff's questioning regarding money and drugs. (T.11, 21, 38-40). Corporal Cramer testified that Detective Pfaff ceased questioning the defendant after his request for an attorney. (T. 40).

The defendant has a rather lengthy criminal history. The defendant's criminal history shows that he has been arrested forty-three times. (Gov. Ex. 1). The defendant's criminal history reveals that he has been charged with thirty felonies resulting in at least three felony convictions in the State of Delaware. (T. 14). The defendant's criminal history also includes fifty-two reported misdemeanor charges resulting in twelve convictions. (T. 14). In at least one of the defendant's previous arrests, the defendant was read, and stated he understood, his *Miranda* warnings. (T. 15-16) (Gov. Ex. 2).

## III. LEGAL ARGUMENT.

The Defendant's *Miranda* Waiver was Knowing, Voluntary, and Intelligent.

The defendant has moved to suppress his January 10, 2008 statement on alternative grounds. First, the defendant contends that his statements made to detective Pfaff were made without the benefit of *Miranda* warnings. Alternatively, the defendant contends that, assuming *Miranda* warnings were given, his statements were not made "knowingly, intelligently, or voluntarily." For the reasons set forth below, neither of these claims has merit.

1. The defendant received *Miranda* warnings.

It is undisputed that the Government may not use statements in its case-in-chief made as a result of custodial interrogation by law enforcement officers unless the defendant has been advised of, and validly waived, his rights: (1) to remain silent, and that any statements can be used as evidence against him; and (2) to the presence of retained or appointed counsel during questioning. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

In *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989), the Supreme Court explained that *Miranda* warnings do not have to be given in the exact words that the court scribed in its landmark *Miranda* decision. The Court wrote "The prophylactic *Miranda* warnings are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.' " *Id.* at 203. (quoting *Michigan v. Tucker*, 417 U.S. 433, 444 (1974)). The Court continued, "The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda*." *Id.* (*citing California v. Prysock*, supra, 453 U.S. 355, 361 (1981)).

Despite the defendant's contention, the defendant was given his *Miranda* warnings by Detective Pfaff. The testimony presented to the Court is that Detective Pfaff advised the defendant that he had a right to remain silent and that any statement he made could be used against him. The defendant was also advised that he had a right to an attorney and that if he could not afford one, he could have one appointed to represent him. Furthermore, the testimony shows that the defendant was advised that he had the right to have an attorney present during the questioning by the officer. Additionally, the defendant's statement, after telling the Detective what type of gun he threw out of the window, that he thought he should have a lawyer, indicates

that he was fully aware of, and understood his rights. The *Miranda* warnings given by Detective Pfaff were sufficient to convey to the defendant his rights as required by *Miranda*.

2. The defendant's waiver of *Miranda* rights was made knowingly, intelligently, and voluntarily.

Given that the only testimony presented to the Court reveals that the defendant was given his *Miranda* warnings, the Court must then analyze if the defendant's waiver of his rights was "knowing, voluntary, and intelligent." The Government submits that, in reviewing all the necessary elements, the defendant's waiver was valid.

The Government bears the burden of proving, by a preponderance of the evidence, that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. *Colorado v. Connelly*, 479 U.S. 157, 168-70 (1986). Furthermore, the Government bears the burden of proving that the defendant's statements were voluntarily given.[2] On this point, the Supreme Court has stated that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Connelly*, 479 U.S. at 167.

An evaluation of a purported waiver of *Miranda* rights involves a two-step analysis. First, the Court must determine whether the waiver was a product of "a free and deliberate choice

[2]The fact that the defendant was handcuffed and questioned by police does not automatically make the statement involuntary. In *Miller v. Fenton*, 796 F. 2d 598 (3d Cir. 1986), the Third Circuit found Miller's post-arrest confession to murdering a women was voluntary. In that instance, Miller spent approximately seventy-five minutes at the police barracks in a waiting room. He then faced an hour of interrogation by a New Jersey Trooper. The Third Circuit wrote, "We emphasize that the test for voluntariness is not a but-for test: we do not ask whether the confession would have been made in the absence of the interrogation. Few criminals feel impelled to confess to the police purely of their own accord, without any questioning at all...Thus, it can almost always be said that the interrogation caused the confession." *Miller v. Fenton*, 796 F. 2d 598, 604-5 (3d Cir. 1986).

rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, the Court must determine whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* In making these determinations, the Court should review the totality of the circumstances surrounding the interrogation, including the background, experience, and conduct of the suspect. See *Moran*, 475 U.S. at 421; *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983). It is well-established that a waiver may be made expressly or may be implied from the defendant's conduct. See *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *United States v. Cruz*, 910 F.2d 1072, 1080 (3d Cir. 1990).

In determining whether a statement was voluntary, the Court must determine whether the statement was the product of an essentially free and unconstrained choice by its maker, and that the defendant's will was not overborne. *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994). In making this determination, the Court should consider the totality of the circumstances. See *id.* Factors include whether there was police coercion, length of the interrogation, location of the interrogation, continuity of the interrogation, and the defendant's maturity, education, physical condition, and mental health. *Swint*, 15 F.3d at 289. Also important is whether the police advised the defendant of his *Miranda* rights. *Id.* Unless there is coercive police conduct causally related to the defendant's statement, the statement must be considered voluntary. See *Colorado v. Connelly*, 479 U.S. 157, 164, 167 (1986). Thus, the Court should not find the defendant's statements to be involuntarily made unless it finds that the statements were a direct product of police overreaching. *Swint*, 15 F.3d at 289.

There was no "coercive police conduct" present during the interview, nor were the

defendant's statements the product of police overreaching.[3] The interview occurred in the defendant's bedroom shortly after the police entered and lasted only minutes. The defendant was given his *Miranda* warnings. The questioning ceased as soon as the defendant stated that he thought he should get a lawyer. There is absolutely no testimony that there was any intimidation or deception prior to the defendant's statements to Detective Pfaff.

The defendant's maturity, mental and physical condition, and mental health display that he was capable of waiving his rights. Prior to interviewing the defendant, Detective Pfaff gave *Miranda* warnings to the defendant; the defendant stated the he understood his *Miranda* rights. The defendant is a twenty-six year old male apparently in good health. Although the defendant was in handcuffs, he remained in his bedroom and was seated on his bed. Given the conversation with Detective Pfaff and the answers given by the defendant, it is clear that the defendant is speaks and understands the English language. There were no apparent mental or physical impediments facing the defendant when he agreed to answer the Officer's questions.

It is also important to look to the defendant's background, experience, and conduct. In the defendant's case, his prior experiences demonstrate familiarity with the criminal justice

---

[3]Examples of "police overreaching" can be found in *Mincey v. Arizona*, 437 U.S. 385 (1978) (defendant subjected to 4-hour interrogation while incapacitated and sedated in intensive-care unit); *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (defendant, on medication, interrogated for over 18 hours without food or sleep); *Beecher v. Alabama,* 389 U.S. 35 (1967) (police officers held gun to the head of wounded confessant to extract confession); *Davis v. North Carolina*, 384 U.S. 737 (1966) (16 days of incommunicado interrogation in closed cell without windows, limited food, and coercive tactics); *Reck v. Pate*, 367 U.S. 433 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); *Culombe v. Connecticut*, 367 U.S. 568 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); *Payne v. Arkansas*, 356 U.S. 560 (1958) (defendant held incommunicado for three days with little food; confession obtained when officers informed defendant that Chief of Police was preparing to admit lynch mob into jail); *Ashcraft v. Tennessee*, 322 U.S. 143 (1944) (defendant questioned by relays of officers for 36 hours without an opportunity for sleep). *Connelly*, 479 U.S. at 164.

system. The defendant's forty-three arrests resulting in at least three State felony and twelve misdemeanor convictions show a knowledge of the criminal justice system. The fact that the defendant, during a prior arrest, was read and stated he understood his *Miranda* rights further supports the assertion that he understood the ramifications of speaking to an Officer. It would be difficult to believe that at this stage of his criminal career that the defendant would not understand the rights granted by *Miranda*.

In reviewing the defendant's actions during the questioning by Detective Pfaff, the evidence presented shows that the defendant's actions were "knowing and voluntary." First, when asked about money in the house, the defendant responded in the negative. When asked a second time, the defendant did not verbally respond, but instead pulled back a mattress cover to reveal approximately one thousand dollars. After responding that he threw a nine-millimeter firearm out of the window, the defendant stated that he did not think he should answer any questions and requested a lawyer. The defendant's actions demonstrate that he was fully aware of his *Miranda* warnings and his response to Detective Pfaff's questions were "knowing and voluntary."

The evidence presented through the testimony of Detective Pfaff and Corporal Cramer show that the defendant was given his *Miranda* warnings. In reviewing a totality of the circumstances, the record demonstrates that the defendant was aware of his Miranda rights and knowingly, intelligently and voluntarily waived those rights in speaking to Detective Pfaff.

## IV. CONCLUSION.

WHEREFORE, the United States respectfully asks the Court to deny the Defendant's Motion.

Respectfully submitted,

COLM F. CONNOLLY
United States Attorney

By: /s/ Shawn Martyniak
Shawn E. Martyniak (De. I.D. No. 4433)
Special Assistant United States Attorney
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, Delaware 19899-2046

Dated: May 19, 2008.

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 08-07-SLR |
| | : | |
| RYAN EVANS, | : | |
| Defendant. | : | |

**ORDER**

The Court, having considered the Government's *Response* to the Defendant Evans' *Motion to Suppress Statements*:

IT IS HEREBY ORDERED this ______ day of _________, 2008, that the Defendant's motion is denied for the reasons stated in the Government's response.

_______________________________
The Honorable Sue L. Robinson
United States District Court