IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | Criminal Action No. 08-07-SLR |
| RYAN EVANS, | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**PRE-TRIAL MOTION TO SUPPRESS STATEMENTS**

Defendant, Ryan Evans, by and through his undersigned counsel, Eleni Kousoulis, respectfully submits this Memorandum of Law in support of his Pre-trial Motion to Suppress Statements. For the reasons set forth below, Mr. Evans seeks to suppress any and all statements made to law enforcement officials on or about October 12, 2007.

**I. INTRODUCTION**

On January 22, 2008, the Grand Jury for the District of Delaware returned a three-count Indictment against Mr. Evans, charging him with: (1) knowingly possessing with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); (2) knowingly carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); and (3) being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On March 14, 2008, Mr. Evans filed a Pre-trial Motion to Suppress Statements, arguing that he was never advised of his Miranda rights prior to being questioned by law enforcement officials, or that any alleged waiver of his rights was knowing, intelligent or voluntary.

On April 30, 2008, this Court conducted an evidentiary hearing on Mr. Evans' motion. The

Government filed its Post-Hearing Response to Mr. Evans' suppression motion on May 19, 2008. Mr. Evans now files his response.

## II. PROPOSED FINDINGS OF FACT

On January 10, 2008, officers with the Wilmington Police Department's Drug Unit and SWAT team executed a daytime search warrant at 428 South Jackson Street, in Wilmington, Delaware. (Tr. 3-5). Upon arrival at the home, the SWAT team used force to open the front door, while several detectives positioned themselves at the front and rear of the home. (Tr. 5, 6, 19-20, 32).

Detectives Randolph Pfaff and Charles Emory subsequently entered the residence and were advised that Mr. Evans and Millicent Evans, his aunt, were located inside the home. (Tr. 5, 17). Detective Cunningham, who had been in the rear of the residence, advised Detective Pfaff that a metal object had been thrown out of a window and "landed relatively close" to officers in the alleyway. (Tr. 8, 24). Detective Pfaff, however, testified that none of the officers saw anything being thrown. (Tr. 29).

Detective Pfaff responded to the bedroom in which Mr. Evans was located, and Detective Emory responded to the bedroom in which Ms. Evans was located. (Tr. 6, 18). According to Detective Pfaff, Sergeant Christopher Villaverde and Master Corporal William Gerhardt used force to enter Mr. Evans' room, and by the time of Detective Pfaff's arrival, Mr. Evans had been secured and handcuffed. (Tr. 7-8, 18, 21).

Detective Pfaff testified that upon entering Mr. Evans' bedroom, he noticed that the room's only window faced east, was up approximately three inches and had a "huge hole" in its screen. (Tr. 8). Detective Pfaff further testified that he administered Mr. Evans' <u>Miranda</u> warnings because he

"believed . . . a firearm [had been] thrown out the window, and I wanted to talk to him about it. That, and if there was anything else in the residence." (Tr. 9-10, 21).

Detective Pfaff further testified that he did not advise Mr. Evans whether he understood a particular Miranda right, but, rather, "read the whole thing . . . then asked if he understood his rights." (Tr. 22). According to Detective Pfaff, Mr. Evans stated that he understood his rights. (Tr. 10, 21-22). Detective Pfaff never asked Mr. Evans if he waived his rights and would agree to make a statement. (Tr. 22). No other officers were present in the room during Detective Pfaff's initial interrogation of Mr. Evans. (Tr. 19, 23-24).

Detective Pfaff asked Mr. Evans if he had any drugs or large sums of money in the home, and he responded that he did not have any drugs or money. (Tr. 10-11, 22-23). Detective Pfaff testified that he again asked Mr. Evans if he had any drugs or money in the home, and that Mr. Evans, who was seated at the foot of the bed "with his handcuffs behind his back, . . . pulled the [bed's] padding towards him, which revealed a sum of money that he stated was about a thousand dollars." (Tr. 11, 19, 23-24). Mr. Evans did not make any statements regarding drugs. (Tr. 23).

After Detective Pfaff discovered the money, Detective Emory reported to the room, advised him that the metal object was a handgun and went to Ms. Evans' room. (Tr. 25-26). Detective Cramer then entered the room, and Detective Pfaff asked Mr. Evans "what kind of gun it was that he threw out the window, and he advised me it was a 9-millimeter." (Tr. 11, 24, 26-27, 39).

Detective Pfaff testified that Mr. Evans then stated that he "didn't think he should answer any more questions, and that he should have a lawyer." (Tr. 11, 40). According to Detective Pfaff, Mr. Evans was "distraught," and the interrogation shifted to Mr. Evans' aunt, who has colon cancer. (Tr. 28-29). Detective Pfaff denied insinuating that he would arrest Mr. Evans' aunt if he did not

3

cooperate or answer questions regarding the handgun. (Tr. 28).

Detective Pfaff also testified that Detective Silva located five packaged bundles of heroin in Mr. Evans' top right dresser drawer, and Detective Cramer found $249 in a pair of jeans in the bedroom. (Tr. 12). Detective Pfaff found two bundles of heroin and $55 in a coat in Mr. Evans' bedroom, along with packaging material. (Tr. 12).

### III. PROPOSED CONCLUSIONS OF LAW

The Fifth Amendment of the United States Constitution protects a citizen from being "compelled in any criminal case to be a witness against himself." US CONST. Amend. V. See also, United States v. DeSumma, 272 F.3d 176 (3d Cir. 2001) (noting that the Fifth Amendment bars the prosecution from using compelled testimony in its case in chief because the failure to administer Miranda warnings creates a presumption of compulsion, and even unwarned, voluntary statements are excluded from evidence). In Miranda v. Arizona, 384 U.S. 436 (1966) the Supreme Court defined custodial interrogation as "questioning by law enforcement officers after a person has been taken into custody or deprived of his freedom of action in any significant way." Id. at 444.

The Court premised this rule on the proposition that custodial interrogation is inherently coercive, and individuals subject to that form of questioning must be independently protected against intrusions on their rights. Id. at 533. See also, Rhode Island v. Innis, 446 U.S. at 301 ("[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.").

"In determining whether an individual [is] in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was]

a 'formal arrest or restraint in freedom of movement' of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318 (1994) (quoting California v. Beheler, 463 U.S. 1121 (1983)) (stating that the initial determination of custody depends on objective circumstances and not, on the subjective views of the interrogating officers or the person being questioned). See also, Berkemer v. McCarty, 468 U.S. 420 (1984) (stating that the relevant inquiry is how a reasonable person in the suspect's position would have understood his situation); Rhode Island v. Innis, 446 U.S. at 300-01 (1980) (". . . Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."); United States v. Jacobs, 431 F.3d 99 (3d Cir. 2005) (stating that if Miranda warnings are not given before a person is in custody, evidence resulting from the questioning must be suppressed).

In Jacobs, the Third Circuit explained:

> [T]here are at least three differently worded tests for when a person is in custody: (1) when the person has been deprived of her or his freedom in some significant way; (2) when a reasonable person would perceive that she or he was not at liberty to terminate the interrogation and leave; and (3) when there is a restraint on the person's freedom of movement of the degree associated with a formal arrest.

Id. at 105. The Court further noted that three factors should be weighed to determine if an individual is in custody:

> One is the location of the questioning. We have stated that 'all 'station house' interrogations should be scrutinized with extreme care for any taint of psychological compulsion or intimidation because such pressure is most apt to exist while a defendant is interviewed at a police station. A second factor is the information known by the officer concerning the suspect's culpability. 'The more cause for believing the suspect committed the crime, the greater tendency to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers Miranda and vice versa.' And a third factor is whether the officer revealed his or her belief that the suspect was guilty.

Id. at 105 (quoting Stansbury v. California, 511 U.S. at 325 ("An officer's knowledge or beliefs may

bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned.").

Thus, in order to obtain legally admissible statements during custodial interrogation, the interrogating officers must apprise the party subject to questioning of the Miranda rights to counsel and silence, *and* secure a waiver of those rights before continuing questioning. Id.  This waiver must be given "voluntarily, knowingly and intelligently," and the government bears the burden of proving compliance with the procedural safeguards. Id. at 444. See also, Frazier v. Cupp, 394 U.S. 731, 739 (1969) (stating that courts must examine the totality of the circumstances to determine the voluntariness of self-incriminating statements).

Here, Mr. Evans was immediately subject to custodial interrogation for purposes of Miranda. When Detective Pfaff arrived at his bedroom, Mr. Evans was handcuffed and secured. Thus, Mr. Evans' freedom of movement had been restrained in the degree associated with a formal arrest. See Stansbury.

The record further demonstrates that the interrogating officer neither asked if Mr. Evans understood each of his Miranda rights, nor obtained his express or implied waiver or consent to questioning to ensure that he understood the nature of the rights being abandoned and the consequences of any decision to abandon them. Accordingly, where Mr. Evans did not make a voluntary, knowing and intelligent waiver of his Miranda rights, the evidence in this matter should be suppressed.

## IV. **CONCLUSION**

For the reasons set forth, Mr. Evans submits that all statements, which law enforcement officials obtained in violation of his Fifth Amendment rights, must be suppressed and excluded at trial.

Respectfully submitted,

 */s/ Eleni Kousoulis*
Eleni Kousoulis, Esquire
Assistant Federal Public Defender
704 King Street, Suite 110
Wilmington, Delaware  19801
(302) 573-6010
ecf_de@msn.com

Attorney for Defendant, Ryan Evans

Dated: June 2, 2008